We'll go to our second case of the day. Tempel v. School District of Waukesha Ms. Murshid, whenever you're ready. Good morning. May it please the court. My name is Summer Murshid and I represent Plaintiff Appellant Melissa Tempel who joins me in the courtroom today. This case centers on a public school teacher revealing information about the school district's application of a policy in the lead up to a school board election and in the midst of a two year running controversy. The school district claimed that the speech was disrupted, but every single component of the claimed disruption is disputed. They had to have police officers at the school and security at the school. I mean, how could you possibly distinguish this case from a hedge path? Three reasons, Your Honor. I mean, I know the plaintiff in that case had been warned, but what difference does that make to the First Amendment analysis? I can't, none. Sure. So, I want to distinguish this case from hedge path for a couple of really important reasons. The first is the speech itself was materially different. In hedge path, this court said where public employee speech involves expertise or knowledge gained through status as an employee, the court must presumptively elevate the teacher's interest over the employer's interest in avoiding disruption. That's important because it puts us in that specialized knowledge category. How could that possibly? You're saying in this case there was specialized knowledge? Yes, Your Honor. Boy, I'm having real trouble seeing that. Yes, of course. I'm happy to explain. In hedge path, she was commenting on a matter of public concern in the broader community. It was the George Floyd controversy. It had nothing to do with what was happening at school. But here, if it only has anything to do with what's going on at school, it's not a matter of public concern. You lose there. It's certainly a matter of public concern, so here's why. And context matters. When we are looking at whether something is a matter of public concern, we're asking, what is the context? But that makes it much broader than her expertise. You can't have it both ways, right? You can't just say, oh, she was simply commenting on the little song, and then say, oh, this was a big matter of public concern. You can't possibly have it both ways. I don't think we do, Your Honor. What we're saying is that in the midst of two years of controversy, controversy specifically about the application of the district's controversial issues policy, two years, the district had applied it to ban signs, had applied it to be able to suspend a teacher. There was a Change.org petition. There were 54 teachers who resigned, many of them citing the controversial issues policy. This was not commentary on a public, on a little song. This wasn't just her making a complaint about something that was going on at work. She was providing information to the public. Hadn't the school district also, in regards to the First Amendment speech, the district, in response to concerns from the community about 20 or so times the year before, also talked about or attempted to explain why they were taking certain steps or doing certain things? Had the district explained to the community? Yes. Had this become a public issue? Oh, yes. The police were called three times to board meetings in the years prior, given the level of public interest. This was covered on national news multiple times. Doesn't this make it worse for your client and not better?  Because at some point, we have to look to what the school did. And Hedgepeth, I think, gives us the answer. So I think Hedgepeth gives us the framework. But it's a very different case than Hedgepeth. It's just a different political message. This court is enough, but the politics don't matter, Your Honor. I agree. How did the district, did the district prove, and it's a heightened burden, did the district meet its burden to connect the need to call the police, to connect the increased emails and phone calls? Did they connect it to any substantial disruption to the effective functioning of the school? And the answer is no. You know, I'll grant you this is different than Hedgepeth, which I know well. But I think the issue becomes, even if you zoom in, and we assume this is an issue of public concern, and that your client elevated this issue, which was an issue of public concern. Yes, Your Honor. Things started happening after she tweeted. That, I think it's undisputed word, disruptive. Correct? And your client didn't stop tweeting. Right? So I think even if you limit the disruption to the first tweet, and spring break, and right after spring break, I mean, you have a lot of disruption of the efficiency of running a school. For tender-aged children, right? This is another difference. You know, we were dealing with a high school, right? So when we look at that disruption analysis and that narrow time period, I mean, that was significant disruption, more so than in Hedgepeth. With police presence, a threat, even if not credible about a school shooting, it was more than in Hedgepeth, right? And that's the balancing. Even if we take and assume that this was an issue of public concern. And provided the specialized knowledge that this court held was not existent in Hedgepeth. But I think even if we accept it, we're saying, if we accept 1A, as the Supreme Court explained in Kennedy, if we accept that this was, by now, by the time she tweets, is an issue of public concern. We're asking you to move forward under the balancing. Yes, and my point in what we're asking this court to, why we're asking the court to reverse and remand, is because, unlike Hedgepeth, this case is full of disputed facts. Everything the district claims is disruption is disputed. So I'll address, for example, this issue of police presence. There is evidence in the record that there was no impact on school. There are five affidavits in the record where teachers who were at higher state, the police presence didn't impact drop-off, it didn't impact pick-up, it didn't impact how we were teaching our kids. Schools operated, everything continued to function effectively. So you're saying the question that we're answering today is, was the school closure, or course of conduct, let me use that, was their course of conduct narrowly tailored in pursuit of the interests of the school alleged? I'm asking this court to hold the district accountable to meet its heightened burden. And on this record, there is enough evidence to suggest that summary judgment should not have been found in the school district's favor. So the question is... I still need you to answer my question, and that is whether or not, if we're sending it back for disputed facts, I'm trying to elicit from you what of the school's course of conduct was not narrowly tailored? Or are you suggesting that we don't know whether or not they meet the heightened standard because factually the school has not shown what they actually did? I'm trying to distinguish where you're wanting us to go. I'm sorry. Where I like this court, where I think the issue is, is the district has claimed disruption. And they have pointed to a number of things. And it would be disingenuous for me to say there wasn't some disruption. But the First Amendment doesn't say, no disruption. That's not what it says. What it says is the district has to prove substantial disruption to the effective operating of the school. And so where I think the issue in this case, and what makes it different than Hedgepeth, is the evidence in the record that wasn't considered by the district court that would suggest that the disruption wasn't substantial. But isn't this a question of law? You're asking the jury to determine a question of law. We know it's a question of law. There's no doubt the district has to show that its interest in workplace efficiency outweighs your client's First Amendment interests. That's a question of law for the court to ask, for the court to answer. It seems like you're arguing for a jury trial on a question of law. Pickering is a legal question, Your Honor, but there are predicate facts. We're not to Pickering yet. I understand your contention. I need you to articulate what are the facts that remain in dispute that her actions were not disrupted to the functioning of the school. Happy to do so, Your Honor. So let's start with staff disharmony. This was one of the issues that the district court really sunk into. And there is evidence in this record to suggest that a reasonable fact finder could have concluded that staff disharmony predated Ms. Temple's speech. There are 54 teachers who resigned, many of them citing the controversial issues policy as a reason. There are five affidavits in the record where people are testifying that the speech did not cause the staff disharmony at the district. It was years of sustained controversy. But did it exacerbate it, though? I saw some evidence in the record of it made it worse. It inflamed it. It put fuel perhaps on the fire that had been created by the school district. But still, it inflamed the situation. It may have. But any time you speak up, would it not inflame the situation? Right. And the fact that the public was interested in it, I think supports what we're trying to do here, which is protect First Amendment rights of public employees so that we are ensuring that the public also is able to hear this information. It's not just Ms. Temple's right to speak. It's that the whole community wanted to hear about it. Everybody was interested. And the job of this court is to hold the district accountable to meet the heightened burden so we are ensuring that those First Amendment rights are protected. There's issues about staff disharmony on the record. There's issues about operational disruption. There is no dispute that school continued... What is the operational disruption? Sure. So the... So you're suggesting the one week where police are called, the phone calls are coming in. Those are the district's claims, correct. That it was severely disruptive. What is the material issue of fact that's in dispute? Yes. So... In other words, are you saying those things didn't happen? No, Your Honor. Then there's no dispute. I'm saying there is information in the record to suggest that a reasonable fact finder could have found for Ms. Temple. No, that's a question of law. No. Somebody has to decide the facts. You're saying, though, that there are no facts in dispute. You agree that there was significant disruption, but you're saying that's not enough. I apologize. That's our job. Can I clarify? Sure, of course. So I'm saying that the district has asserted there was some disruption. There are facts in the record that would have allowed a reasonable fact finder to find that the disruption was not substantial enough to suppress Ms. Temple's speech. No, that's the legal question. I think Judge Pryor keeps pressing you on what facts are in dispute. She said the light was green. The defendant said the light was red. That is a factual dispute. You're not telling us any factual disputes. You're just telling us that we disagree regarding the impact of the facts, the significance of the facts, but we agree that there was disruption. Well, I think it's a little bit different. The district court drew an inference based on certain facts in the record. There are other facts in the record that were disregarded that represent materially disputed facts that impact disruption. I just need you to tell me what those are. They weren't disputed, though. Staff disharmony. I think staff disharmony being attributable to Ms. Temple's speech. We have teachers who say, nope, I didn't leave because of her tweet. I left because of everything else that was going on. Precisely. What other facts? Yes. So school continued to operate. There was no shutdown. These are not disputed facts. He is not going to get up here and say the school shut down and couldn't operate. No, he's going to get up here and say it was totally substantially disrupted, but he can't tell you anything that didn't happen. Okay, I think we're just talking past each other at this point because we're not getting to disputed facts. He's going to get up here and say, I agree with all the facts. I agree. But he has to be able to point. It's his burden to be able to point to how it was disruptive. Well, the police were called. There's a police presence at the school. You have to agree that that is disruptive. I would agree with you that the record suggests that was a precautionary response, but there is a disputed fact over whether there were actually threats, whether there was anything that justified that precaution. Do you think the police just showed up and they had nothing better to do in Waukesha for that week than post officers at the school? They just decided, you know what, let's just show up at Waukesha High School this week and sit outside the school for absolutely no, is that your claim? No, absolutely not, Your Honor. The police make their contract with the school district and they often provide threat assessments. Why were they contacted? They were contacted in this case to provide a threat assessment. Why? Because of the public response to Ms. Temple's speech. No disputed fact. He's going to agree with you. But doesn't that bring us closer to the Supreme Court's decision in Kennedy? People seem to forget where when the coach wanted to go and pray on the 50-yard line after school, after the football game, there was an increased police presence to allow that coach to go and pray on the 50-yard line. There was an increased usage of school resources to post around the stadium. Do not go onto the field after the football game. The fact that there are police presence because someone has chosen to exercise their First Amendment right could not be the end-all be-all of where the Constitution stops for public employees. So what I'm asking you for the past 10 minutes is for you to articulate any other facts that if we send this back that you are asking a jury factually to decide. Because factually, we know police were there. Factually, we know phone calls came in. But that was not what allowed the First Amendment to stop for the coach in Kennedy. And so if you're asking us to send it back for a factual development, what other facts are we looking for? I see that my time is up, but I'm happy to respond. I need you to answer the question. Yes, thank you, Your Honor. So are you asking specifically about the police or just any other I'm asking. We know the police were there. We know that fact. What fact do you want the jury to determine? Well, I'd like the jury to be in a position to be able to consider the March 29, 2023 police report is not sufficient. So that's a conclusion. So we have the police report. So they don't have to decide that because we have the police report. Are there any other facts? Because we get to interpret the facts. Beyond what we've talked about, that school continued to operate, that the operational disruption was at best an increase for the superintendent, but didn't actually prevent anybody from not being able to complete their job duties. Beyond the fact that there is evidence to suggest that is disputed, that staff disharmony predated Ms. Temple's speech. Those are the important facts that a jury has to decide here. Whether or not there was disharmony amongst the staff factually before the tweet. Correct. And the evidence in the record would suggest that it was. And that's why summary judgment was not proper in the school district's favor. All right. Thank you. Let's hear from Mr. Azir. Mr. Azir, I hate to start you with a question, but let me ask you if you agree that the police report indicated that there was no verified threat. We do agree with that, Your Honor. Yes, sir. Or do you agree that the school continued to operate? Operate? Yes. Operate as normal? No, Your Honor. Do you agree that there was no shutdown? Yes, Your Honor. Do you agree that there was staff disharmony that predated the tweets? Yes, Your Honor. Then what facts are in dispute? Can you help me? Your Honor, there are absolutely, positively no facts in dispute. Plaintiff simply does not like the legal conclusion but she cannot point to a single factual dispute because none exist. The staff disharmony? I beg your pardon, Your Honor? The staff disharmony. She said that was real. There was unrest amongst the staff and people were leaving before the tweet. Correct, Your Honor. Before the tweet and after the tweet. And individual specific teachers who identified this specific situation as the reason that they were leaving. This was the straw that broke the camel's back. This is hedge path all over again. I don't disagree with that characterization. So let's go back to where Judge Kirsch is trying to lead the lawyers and everybody's fighting against it. If we're here in Step 2 of Pickering, okay, and what we're trying to figure out is the sincerity and the severity of both the alleged disruptions. Can we just focus in on that? What were the alleged disruptions caused by the exercising of this speech? Because that is critical to determining whether or not there was a First Amendment violation. Absolutely, Your Honor. First of all, it's important to note that the district court considered testimony and cited to that testimony from 12 different sources. Superintendent James Siebert, Principal Mark Schneider, Dr. Joe Cook, Sharon Thede, Sue Edinger, who was the assistant to the superintendent, Yacina Chepero, who was the secretary to the principal, first grade teacher Mary Deller, teachers Chelsea Hansen, Christy Spellman, Marisa Nestis, Amy Davis, a parent of a student at Hoyer Elementary. Well, the parent doesn't work at the school, so we want to focus on, I think that's where the distraction becomes. Everybody's talking about the conclusion, but not allowing us to logically get there. So what about their statements and that list of names you just provided, what about those statements factually demonstrate that there was disruption to the functioning of this public school? Do you want me to only focus on the disharmony or the overall functioning of the school? I think we can do it both ways. If you want to start at the disharmony and then go to the, but I think both are helpful. So there were nine separate incidents that were cited in the court's decision. And I'll talk about each one of those. Through Dr. Siebert's testimony, he testified that several parents during spring break contacted him directly and asked what measures were going to be put in place to ensure that the school was safe. By this time, the public had become aware of the comments where an individual actually said, let's hope that this school is the next school shooting. Let's hope that the tragedy is not exacerbated and that they appear across the country. So several teachers did in fact, I'm sorry, parents reach out. And so I want to make sure that just so that we understand by the time the superintendent is getting the calls, the school that we're talking about has been identified. That is correct, Your Honor. Who was responsible for identifying the school at issue? If we, because we take the tweet, but we got to kind of move beyond that and the totality of what was happening. It was Ms. Temple, Your Honor. She first started with her very first post. She included hashtag Waukesha School District. Multiple times she either did at or did hashtag for the Waukesha School District. In response to questions, she was asked at what school? She responded, I'm a first grade teacher at Higher Elementary. So she identified the school through her responses to questions she received on social media. So that put a square, that put a target right on the school. It identified the specific school and identified what classroom she taught. So that's how we got to this point and how then students, I'm sorry, parents of students kept coming forward and saying, what do you have in place to keep us safe? Mary Deller was the other first grade teacher. She testified during her deposition that she specifically reached out to the principal and the superintendent and asked, what are you going to do to ensure we're safe? What am I supposed to tell parents when they ask if it's safe for kids to come to school after spring break? That was the second incident. The court heard testimony from three employees. Nobody wants to talk about Kennedy where the coach, the head coach, said, I'm not coming back. Sitting out on that field after every Friday night game, I have a target on my back because we have all of this controversy around wanting to go out and utilize the First Amendment to be able to do this. And so the first grade teacher calling and saying, I don't feel, I feel unsafe or the school could potentially be unsafe because of Ms. Temple's actions going back to that balancing. Yes, Your Honor. We again believe that that is part of the balancing test here, is that the actions of Ms. Temple created fear and apprehension among parents, among teachers, and among staff. I guess you have to recognize, though, that this is different than Hedgepeth because the origin of her message was the school's actions, right? She was elevating the school about the school's actions, not just running her mouth about random political messages, right? So it is different from Hedgepeth. It is in that regard, yes, Your Honor. I agree that it is different in that regard. But still, all the other lessons from Hedgepeth come into play here. Everything from the argument about specialized knowledge. In Hedgepeth, this court said, specialized knowledge comes when a teacher or a member of a public entity gains some insight, gains some knowledge, and then presents... That was actually one of only a handful of people who knew about the ban of the song, three or four people, correct? I didn't understand. Ms. Temple was one of a handful of people who understood that the song had been prohibited for the show, correct? Correct. So that is, maybe specialized knowledge is a bit of an exaggeration, but she was privy to some information because of her role as a first grade teacher, right? But she didn't share the actual information that she learned. Instead, she created a false narrative regarding a war on rainbows and then perpetuated that false narrative. If we go back and look at the...  is to the LGBTQ community as to that's where this is, when she says, when will it stop? Is she trying to continue to make this leap to what has happened the previous year? She is trying to turn this incident into something it was not. If we go back and we look at the timeline, and the timeline is critical here. On March 20th, Mr. Ziegler sends out a list of songs that could be considered by the district. On March 21st, he goes to Principal Snyder and recommends, among other songs, and it's not controverted, that he Googled Miley Cyrus. He thought the lyrics were too much. It wasn't the lyrics, Your Honor. Because I like Dolly Parton. He actually saw... His exact testimony was when I Googled Miley Cyrus, I saw the outfit she was wearing. I was appalled and I questioned whether she was an appropriate role model for first grade students. It had nothing to do with the lyrics. It was Miley Cyrus. Was it another school show at some point? Later, at a higher grade level, yes. Higher is what? K through four? K six, I believe. Five. K through five, okay. So again, after making that determination, Mr. Snyder talks with Mr. Ziegler. Rainbow Connection was another one of the songs on the list. They both agree that is a great song and it can be sung. That same day, on March 21st, Mr. Ziegler sends an email to all the teachers, all the first grade teachers, that says, Rainbow Land is out, Rainbow Connection is in. Later that same day, Mr. Ziegler has a meeting specifically with Temple and explains to her the exact reason why Principal Snyder was banned. He explicitly states to these two individuals, the first grade teachers, that it had to do with Miley Cyrus. An hour later is when Ms. Temple posts her first post and says Rainbow Land was banned by the district. When will it end? And then does the hashtag at G-Safe Wisconsin, LGBTQ community, all of those different elements. And that Rainbow Land was a problem. So we have the staff disharmony. We probably should move, the time you have, to the operations. I'm sorry. We should move to the operations. How did that move to the operations? Oh, move to the operations. From the staff disharmony, let's talk about the operations. So again, spring break, we have to remember spring break was going on. On March 31st of that year, which was a few days before spring break ended, Amy Davis, one of the parents, approached the superintendent with a number of concerns, asking what is the district going to do to prepare for this. And that is when the preparations with the police department came into play. Dr. Siebert testified again that during almost the entirety of spring break, he spent time responding to how they were going to have a safe return, making a determination whether there was any credible threat. Ms. Ettinger, who was the assistant to the superintendent, testified that during spring break, she was inundated with phone calls and text messages and emails to which she had to respond. Well, we know the school's not operating during spring break. And during the week afterwards, she said that she spent a week trying to respond to those. The assistant at the elementary school testified the same way. She testified in the week after spring break there were at least between 15 and 30 text messages, emails, or calls that substantially disrupted her ability to continue to do what her normal job was. Principal Schneider testified that he noted significant disharmony among the staff and with individuals who were having trouble trying to focus on what was going on. And in fact, there was even a declaration that was provided by a former kindergarten teacher by the plaintiffs. And this kindergarten teacher was there at the time this was going on. And she even testified that the presence of the police caught the attention of her students instead of focusing on the lesson plans, the students were actually focused on the police and asking questions regarding why the police were here and whether there was anything that was going on. So those are all disruptions that happened. Those are all disruptions that occurred. Those are all disruptions that impacted the ability of the school district to function. Now, yes, the school did continue. It did not shut down. This is an exceptional school district with exceptional staff. And they worked through an unbelievable situation to ensure that the educational opportunities for those students were not diminished. What would limit the teacher? I don't know how this case is distinguishable from Pickering. We have a teacher with knowledge of what's going on inside the school and speaks up. And because police or text message and phone calls from parents were elevated, the suggestion is teachers are not permitted to speak. Is that because of the public's  to the teacher exercising her First Amendment right? Then I'm just trying to figure out where is the line drawing of Pickering here? I agree, Your Honor. It is a difficult line. But again, as has been said multiple times by the judges, it is a question of law for the court to decide. And the court has to do the balancing test here. And in trying to make a determination on the balancing test, we look at the interest of the school district versus the interest of the employee. When the employee is making a speech and making a statement that isn't factually accurate, that has to weigh against the interest of that individual. This court has said And so really where you're wanting us to focus is the impact that when you do speak up and not give the full context and that's where Judge Joseph really spent a lot of time is the context. You had to really understand the context of this speech. And once you take it out of context, it looks different. But if you place it in the context of what was happening in that particular school district of 2021-2022, anything coming out or suggestive that it impacted this controversial issue policy, we knew the attention that it would receive. And so that's why it outweighs it. I see I'm out of time. May I answer? Yeah. Yes. I do agree that that is the context of it. And where it really sinks the plaintiff's case is during her deposition. And we cite the testimony in the brief. During her deposition, she admits now that it was never about rainbows. And she tries to backpedal and at one point said, I didn't say it was about rainbows. I said that's what I thought it was about. So even she recognizes her narrative was false. And false narratives enjoy no protection under the First Amendment. Thank you, Your Honor. All right. Thank you. We'll give you two minutes to rebuttal. There are a lot of disputed facts coming out of what counsel just said. And whether Ms. Temple thought it was about rainbows or whether her statements were false or not are also questions for        a jury. In fact, everything that my counsel from across the  It'd be more helpful just to focus on those facts. Yeah. I'd be happy to do that. So for example, there is a disputed fact as to whether or not the lyrics or Miley Cyrus were the problem. There's a letter from Dr. Siebert in the record which says, we compared the lyrics from the Miley Cyrus song against the controversial issues policy and concluded that it violated the controversial issues policy. That's a disputed fact. Why it wasn't allowed in the first place. There's disputed facts in the record, which we start at page two regarding what Ms. Temple said and what she knew at the time she said it. The timeline that counsel provided for you is disputed in the record. At the time she tweeted, she believed what she was tweeting. That's what it says in the  But more importantly, the fact that we're having this discussion demonstrates precisely why summary judgment was not appropriate. The question isn't whether we haven't asked that question. No one has told us anything that's in dispute. Well, I think the question at summary judgment is whether there's a reasonable inference that could be drawn in Ms. Temple's paper. That's not what happened at summary judgment. To send it back to the jury, there has to be a material issue of fact. It is factually disputed that there was substantial disruption that impaired the district's ability to  There is evidence in the record that clearly shows the district continued to function. And whether the extent of the disruption, where the disruption came from, whether there was actual disruption, those are all questions for the  Thank you. We'll take the case under advisory order, our third case of the day.